OPINION OF THE COURT
Diane A. Lebedeff, J.
This matter involves a remarkably vigorous and charming woman, now approximately 103 years of age and the widow of a German count. For the past 50 years, she has lived in the same rent-regulated apartment, which has two bedrooms and a maid’s room. The landlord has served a notice of termination, premised upon conditions in the apartment which are claimed to constitute a nuisance. However, the tenant is subject to a guardianship and the guardian now moves for a permanent stay of the notice of termination and the landlord desires to commence a summary holdover proceeding, which poses the legal issue which this decision must address.
As a matter of background, in 1999, the same landlord brought the underlying proceeding for appointment of a guardian pursuant to article 81 of the Mental Hygiene Law. The guardianship action was commenced upon the basis that the condition of the tenant’s apartment indicated incapacity. The landlord did not then desire an eviction. The court evaluator’s description of the clutter was grimly telling, portraying a massive collection of objects from a long and satisfying life jammed into the large apartment. Because the tenant recognized that she experienced difficulties in dealing with her affairs, a guardian of her person and property was appointed with her consent. Shortly after the guardian was appointed in September of 1999, the guardian had the apartment deep cleaned with the ward’s consent and steadily discouraged the ward from bringing home bottles, cans and other objects collected in the street. The deep cleaning involved a significant economic commitment of many thousand dollars.
In March of 2000, the landlord moved for unspecified relief, complaining that the collecting activity continued and some excess objects remained in the apartment. On May 12, 2000, *539 the court inspected the apartment in the presence of the ward, the guardian, the landlord, and the landlord’s counsel. Conditions were remarkably improved. Quite persuasively, the guardian explained that, after the deep cleaning corrected hazardous conditions, a further gradual reduction of excess possessions allowed the ward to come to see the improved conditions as “normal,” to appreciate the improvement, and to be proud of her apartment. The landlord’s motion was marked off without prejudice to restoration (order of Aug. 8, 2000). The guardian then began to address apartment repairs, including painting. Other repairs, including plumbing repairs, were requested from the landlord.
In August of 2000, the landlord issued the subject notice of termination based upon allegations that the ward was creating a nuisance by (1) bringing dead flowers, cans and/or bottles into the apartment, (2) keeping newspapers and printed material in the apartment, (3) having old and rotten food in the apartment, and (4) maintaining the apartment in an unhealthy and hazardous condition, with an infestation of vermin. Prior to the termination date, the guardian sought a stay of the notice of termination from this Court and also sought a permanent stay of a summary proceeding seeking eviction.
Legal precedent clearly supports a motion by a guardian seeking a stay of litigation, upon the basis that approval of the appointing court must be secured to sue a guardian in his or her representative capacity. Once a guardian is appointed for an incapacitated person, litigation against a guardian as representative of the incapacitated person should not proceed without permission of the court which appointed the guardian (Carter v Beckwith, 128 NY 312, 316 [1891]; Smith v Keteltas, 27 App Div 279 [1st Dept 1898]; Shatsky v Sea Gate Assn., 11 Misc 2d 905, 906 [Sup Ct, Kings County 1958]; Sinley v Estco, Inc., 25 Misc 2d 172, 175 [Sup Ct, Nassau County 1960]; Galante v Bucciarelli, 130 Misc 2d 1050 [Just Ct, Westchester County 1986, Nachman, J.]). It is accepted procedure that the claimant may move for such permission or that the fiduciary may seek a stay (see, Copeland v Salomon, 56 NY2d 222, 229 [1982], quoting Pruyn v Black, 105 App Div 302, 304 [3d Dept 1905], affd sub nom. Pruyn v McCreary, 182 NY 568 [1905] [in relation to the same principle as applicable to a court-appointed receiver, “(t)he court, on motion, may set aside or stay the proceeding commenced without its sanction”]).
This obligation to obtain authority from the appointing court to sue a guardian cannot be waived by the guardian or by ac *540 tion of another court, nor is the appearance of a committee or guardian in another action tantamount to permission to sue (Dean v Halliburton, 241 NY 354 [1925] ).[1] Even the appointment of a guardian ad litem by the other court does not excuse this requirement for, as stated in Tudorov v Collazo (215 AD2d 750, 750-751 [2d Dept 1995]):
“It is well settled that a guardian ad litem may be appointed by a court at any stage of an action in which an adult is incapable of adequately prosecuting or defending his or her rights * * * A guardian ad litem may be appointed to represent such a party even when no formal adjudication of incompetence has been made * * * However, a guardian ad litem is not authorized to apply to the court for approval of a proposed settlement of a party’s claim (see, CPLR 1207) or to receive the proceeds of a settlement pursuant to CPLR 1206 * * * Instead, the right to apply for court approval of a proposed settlement and to receive the settlement proceeds is granted to a guardian appointed in accordance with Mental Hygiene Law article 81 (see, CPLR 1206, 1207).” (Citations omitted.)[2]
*541 These principles rest upon the fundamental proposition that, while title to property of an incapacitated person remains with the incapacitated person, the property of a ward is subject to the control of the court:
“If the action had not been commenced until after the * * * appointment of the committee, the service of the summons upon the defendant or his committee without leave of the court might have been set aside by the court * * * or the prosecution of the action enjoined * * * and the plaintiff would also be subject to punishment for contempt, because, although the title to the property remains in the lunatic, the court, by the committee, takes unto itself the custody, care and management of the property for the purpose of preserving it from waste or destruction, and providing for the payment of his debts and the maintenance of himself and family, and the education of his children, and it will brook no interference with the property or with the committee, who is its officer or bailiff.” (Grant v Humbert, 114 App Div 462, 464 [1st Dept 1906].)
This same precept is recognized in Mental Hygiene Law § 81.29 (c), which states:
“The title to all property of the incapacitated person shall be in such person and not in the guardian. The property shall be subject to the possession of the guardian and to the control of the court for the purposes of administration, sale or other disposition.”
Accordingly, it is proper for a guardian to alert the court to the possible loss of property, such as possible termination of the leasehold at issue here. Nor should it be ignored that the guardian’s application to the guardianship court for a stay, brought pro se, conserves the ward’s estate by avoiding the increasingly high cost of retaining a landlord-tenant attorney for motion practice against the holdover, serving the interest of retaining funds for the care of the ward, and is to be much preferred to a contempt motion based upon the landlord’s failure to secure permission to sue the guardian.
In relation to housing issues, the involvement of the court which appointed a guardian under article 81 of the Mental Hygiene Law is particularly critical. The statute itself sets tests to be used to determine a ward’s proper abode, for Mental Hygiene Law § 81.22 (a) (9) reads as follows:
*542 “9. * * * the choice of abode must be consistent with the findings under section 81.15 of this article, the existence of and availability of family, friends and social services in the community, the care, comfort and maintenance, and where appropriate, rehabilitation of the incapacitated person, the needs of those with whom the incapacitated person resides; placement of the incapacitated person in a nursing home or residential care facility * * * or other similar facility shall not be authorized without the consent of the incapacitated person so long as it is reasonable under the circumstances to maintain the incapacitated person in the community, preferably in the home of the incapacitated person” (Emphasis added.)
Thus, a guardian must take action to preserve housing in the community when feasible, as is most often desired by the ward (see, Galante v Bucciarelli, supra, 130 Misc 2d at 1051 [“the elderly * * * although unable to continue to take care of themselves in the homes where they have lived for many years, would prefer to live out their days at home, even alone, rather than be forced to abandon their accustomed surroundings and surrender themselves to institutional care”]). Indeed, if a ward is placed in a skilled nursing facility, a guardian has a duty to continue to monitor the ward’s condition and, if appropriate, relocate the ward to housing in the community, because a nursing home placement should not become “effectively ‘irrevocable’” (Matter of Gambuti [Bowser], 242 AD2d 431, 434 [1st Dept 1997] [vacating discharge of guardian after ward placed in nursing home]).
The significance of availability of housing in the community is further underscored by the statutory and case law recognition that a ward has a liberty interest supporting a community residence. This concept is reflected in the requirement that a guardianship court must appoint counsel when a question arises of whether an alleged incapacitated person should be moved to a nursing home or residential facility (Mental Hygiene Law § 81.10 [c] [3]; see generally, recognizing liberty interest requires assignment of counsel to the indigent in an article 81 proceeding, Matter of St. Luke’s-Roosevelt Hosp. Ctr. [Marie H.], NYLJ, Dec. 8, 1992, at 22, col 2 [Sup Ct, NY County, Glen, JJ, mod and remanded on appeal 215 AD2d 337 [1st Dept 1995]; 226 AD 2d 106 [1st Dept 1996], affd 89 NY2d 889 [1996]), as well as in a guardian’s obligation to review an institutionalized ward’s condition to determine if discharge to *543 the community is appropriate (Matter of Gambuti [Bowser], supra).
Accordingly, for reasons relating to both guardianships in general and Mental Hygiene Law article 81 in particular, the Court holds that an application to stay a notice of termination and protect the leasehold interest of a ward falls within established precedent.
Turning to subsequent procedural issues, when a court is presented with an application involving permission to litigate against an incapacitated person, it may either (1) grant permission to litigate or (2) deal with the matter summarily. As explained in Grant v Humbert (supra), summary disposition of a claim against an incapacitated person is favored over the grant of permission to litigate:
“The court, which by its committee takes possession of the property of the incompetent person, is clothed with full authority to pay all just claims against the incompetent to the extent of his estate, and to determine the validity of claims by reference, if the facts are disputed. This summary remedy is favored by the courts, and is adopted in all cases unless some special facts or circumstances exist which render it necessary or appropriate that the claimant should be permitted by the court to maintain an action for the purpose of having his claim or the extent thereof adjudged.” (114 App Div at 464-465 [citations omitted].)
The court then takes the following action:
“the court’s function on presentation of such a petition is, in the interest of preserving the estate of the incompetent, to examine into the merits of the claim being asserted against him. The court may then grant summary order for payment or allowance; or grant leave to sue; or deny the petition outright. Indeed, since an incompetent person is the ward of the court, the court has the duty and responsibility to make such determination and to refuse permission even to sue where the claim is not a maintainable or valid cause of action.” (Matter of Newkirk, 42 Misc 2d 1067, 1067-1068 [Sup Ct, NY County 1964, Geller, J.].)
In some instances, such as a negligence claim, permission to sue may readily be given (see, e.g., Meek v Martin, 19 Misc 2d 649 [Sup Ct, Nassau County 1959, Pittoni, J.]). Where it ap *544 pears that a hearing is necessary, the court may “compel the claimant to establish [the claimant’s] demand as it may prescribe” (Matter of Delahanty, 63 Hun 634 [table], 18 NYS 395, 396 [1st Dept 1892]) and, if there is an issue of fact, a formal hearing may proceed (see, simple debt claim, Matter of Long Is. Home, 4 AD2d 765, 766 [2d Dept 1957]).[3]
In this case, the Court held a hearing in relation to the condition of the apartment, heard from witnesses on both sides, and reviewed photographs. The witnesses included other tenants who testified in favor of the ward and, on behalf of the landlord, the superintendent and an employee of a corporate tenant of the next door apartment which subleases that apartment to occupants. The testimony and evidence established that the condition of the ward’s apartment is even more improved than when seen by the court almost a year earlier, which then showed massive progress over the original conditions described in the 1999 court evaluator’s report. The evidence established that: all rooms of the apartment contained articles roughly appropriate in amount, although varying in the quality of the housekeeping; dried flower bouquets were no more in number than can be seen every day in many other homes; newspaper stacks were low, a far cry from the previously reported fire hazard of a three-foot-high cabinet-size mound next to the stove; and, now, a home attendant, who has a full-time job elsewhere, comes to the apartment to monitor its contents and clean on a periodic basis. The guardian visits regularly and counsels against collecting objects which would impair the ever-improving status of the ward’s home.
Although the landlord presented photographs which appeared to be a negative portrayal of the apartment around the time of the notice of termination, they also documented the need for plumbing repairs to be undertaken by the landlord and the radical improvement from the original conditions. The court was unclear whether the landlord’s photographs, showing objects out of place, actually portrayed preparation for painting of the apartment. They show two rooms which appear to be freshly painted, while the guardian’s photographs, taken later, show all the rooms newly painted (including the ward’s signature purple color on the living room walls).
Although the collecting activity continues, it has been reduced. The original excess of possessions has been eliminated. *545 The landlord failed to establish evidence of any current unreasonable accumulation of objects in the apartment on a daily or continuous basis, a vermin infestation, or any condition endangering life, health or safety of the ward or other tenants. At the inception of this proceeding, it had been said that the ward daily, or even twice daily, brought in a full shopping cart of rescued objects. At this hearing, testimony was presented that the ward daily brings in one or two supermarket-variety plastic shopping bags with only several objects. This collecting or hoarding behavior is well known to many judges and is nearly impossible to change. A sociologist of this judge’s acquaintance calls it “capitalism gone mad,” a reference to the urge to collect objects of significance only to the collector, disregarding any negative aspect or risk. It is overwhelming testimony to the skills of the guardian, Rita Lambek, PhD., that she has moderated her ward’s behavior.
At the conclusion of the hearing, based upon the evidence and taking into account the credibility of the witnesses, it is determined that the conditions established, even disregarding that they have primarily been corrected, simply do not establish a nuisance sufficient for eviction upon the bases set forth in the notice of termination.
Despite the denial of permission to litigate in this instance, the landlord of a difficult tenant should not be discouraged from seeking permission to sue a guardian. The court has seen a number of such applications which have led to a resolution of such problems. For example, in one instance, after a violent, noisy male tenant realized that he might indeed lose his home because of his objectionable behavior, the tenant, with the support of his guardian and a sympathetic physician located by the guardian, decided to stay on the psychotropic drugs which helped him control his behavior; that tenant was last reported to be mild-mannered. In another case, an assaultive, elderly female tenant voluntarily admitted herself to a psychiatric hospital to address her problems; ultimately, for medical reasons, she did not return to her apartment.
In conclusion, this application made by a guardian to forestall termination of a residential tenancy is found to be soundly based, the application to stay permanently this notice of termination is granted, and, upon the facts as they presently exist, permission to sue the guardian based upon the notice of termination at issue is denied.

. If the lack of authorization is timely raised, leave to sue is often granted nunc pro tunc or permission may be granted to continue the suit (see, Grant v Humbert, 114 App Div 462 [1st Dept 1906] [granting such permission where the objection was raised after passage of statute of limitations]). Where the objection was raised after a jury verdict and appeal, the court determined that this objection had been waived (Van Vooren v Cook, 191 Misc 794 [Sup Ct, Ontario County 1948], affd 274 App Div 966 [4th Dept 1949], lv denied 275 App Div 741 [4th Dept 1949]), but even that court recognized that, if the objection is presented at the outset of a suit, “[t]here seems little doubt that the purpose of the rule upon which this defendant relies is to protect the incompetent’s estate from the necessity of defending claims that are sham, frivolous or otherwise not meritorious. The committee need not be imposed upon and may take advantage of this protection against unwarranted claims by moving to set aside the summons and complaint on the ground that no permission to sue has been granted” (191 Misc at 796).

. An adverse party has a separate obligation to advise a trial court if there is a question of mental disability or incapacity and, absent appointment of a guardian ad litem, a default judgment may be subject to vacature (Sarfaty v Sarfaty, 83 AD2d 748 [4th Dept 1981]; see, same rule if plaintiff appears impaired, Sengstack v Sengstack, 4 NY2d 502 [1958]; see also, same as to landlord-tenant actions, Parras v Ricciardi, 185 Misc 2d 209 [Civ Ct, Kings County 2000, Silber, J.]; and, more generally, Kings 28 Assocs. v Raff, 167 Misc 2d 351 [Civ Ct, Kings County 1995, Finkelstein, J.]). In some instances, particularly in an equity action, a judgment should be shaped to protect the incompetent’s interests (see, specific performance rights to be protected, Wurster v Armfield, 175 NY 257, 262 [1903]).

. This consideration of the merits requires a broader inquiry than that which would occur in relation to an application for a “Yellowstone” injunction (First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d 630 [1968]).